LILLIE CAMPBELL, DEFENDANT IN ERROR, v. SUPREME CONCLAVE IMPROVED ORDER HEPTASOPHS, PLAINT- IFF IN ERROR.

Argued March 6, 1901—Decided June 17, 1901.

Suicide will not defeat recovery upon a contract of life insurance, not procured by the insured with the intention of committing suicide, unless the contract so provides in express terms.

---

On writ of error to the Supreme Court upon judgment re- covered on verdict at the Salem Circuit.

This cause was tried at the Salem Circuit, before the late Mr. Justice Ludlow and a jury. The declaration was upon a benefit certificate issued January 25th, 1897, by a fraternal order, incorporated in Maryland, to Dr. John G. Campbell, of Elmer, New Jersey, a member of a subordinate conclave

located in that town, wherein it promised, upon satisfactory evidence of his death and surrender of the certificate (provided he should be in good standing in the order at the time of his death, and the certificate should not have been surrendered by him and another certificate issued at his request in accordance with the laws of the order) to pay to his wife, Lillie Campbell, out of its benefit fund, the sum of $3,000.

Issue was joined on pleas—*first,* of *non assumpsit,* and *second,* that on December 20th, 1898, said John G. Campbell, being in sound mind, did terminate his life by suicide. The entire controversy at the trial was under the second plea. There was evidence to warrant a finding by the jury that Dr. Campbell intentionally killed himself by a pistol shot, just after his arrest on a charge of forgery, made as he was returning home from professional calls as a physician. The trial justice directed a verdict for the plaintiff, after refusing various requests to charge, presented by the defendant, the most comprehensive of which was as follows:

"That although the by-laws of the defendant, as also the benefit certificate sued on, are silent as to suicide, there is an implied condition in the contract that if the event upon which the risk was assured—the death of the said Campbell— was brought about by his own deliberate act, while in sound mind, there can be no recovery."

Exception was duly sealed on the refusal of this request. If it was properly refused, the direction of verdict was right; otherwise there should be a new trial.

For the plaintiff in error, *Alfred S. Badgley,* and *Olin Bryan* (of the Maryland bar).

For the defendant in error, *Jonathan W. Acton.*

The opinion of the court was delivered by

COLLINS, J. It has been considered by some that benefit societies are *sui generis* as respects the payment of death benefits to dependents of their members, and that the uniform denial of the defence of unexcepted suicide in suits to recover

on their benefit certificates is to be placed on grounds peculiar to the character of such societies. There is no doubt that such defence has never been allowed. *Bac. Ben. Soc.*, § 337, and cases cited. But these societies have no such peculiar *status*. Their benefits stand on the footing of all death claims. I shall treat this case, therefore, as within the general range of life insurance. In the words of the author of a treatise on that subject, published in the year 1891: "If performance by an insurer is, in general terms, conditioned on the death of the insured, there seems no valid reason why death by committing suicide should not be included; and such is the general doctrine." *Cooke Life Ins.*, § 41. Contrary judicial *dicta* will be found in a few decisions in England and in this country, but no direct adverse adjudication until the Ritter case, hereinafter mentioned. The case of *Supreme Commandery* v. *Ainsworth*, 71 *Ala.* 436 (1882), is sometimes cited as such an adjudication, but on a careful reading of the report it is evident that the opinion of the court, declared by Chief Justice Brickell, with much ability, from his standpoint, was not necessary to the decision of the cause.

The application of the doctrine has always happened to be in cases where the insurance was effected for some designated beneficiary other than the insured; and to that extent no state court has departed from it, as will be seen on examination of the cases cited in the most recent publications. 3 *Am. & Eng. Encycl. L.* (*2d ed.*) 1016; *Joyce Ins.*, § 2653; *May Ins.* (*4th ed.*), § 324, *note a* (1900); 4 *Berrym. Ins. Dig.* 1530, *et seq.* (1901).

It should be understood, of course, that I have not been speaking of insurance procured with the intention of committing suicide. That, all courts concede, is voidable, because of fraud.

The Ritter case arose in 1892, was decided in 1895 (70 *Fed. Rep.* 954; 28 *U. S. App.* 612) and affirmed by the United States Supreme Court in 1898. *Ritter, Executor of Runk,* v. *Mutual Life Insurance Co. of New York,* 169 *U. S.* 139.

There were several policies in suit—all alike in tenor, and

all payable to the insured, his executors, administrators and assigns. The real contracts, as evidenced by the applications for them, excepted death by suicide within two years—which time had not elapsed.; but, by virtue of a statute of Pennsylvania, where the contracts were made, the trial court had ruled out the applications, because not attached to the policies, which themselves expressed no such exception. The proof was plenary that the insurance was procured with the intent to commit suicide, but as the trial court had expressly charged the jury that there could, in no case, be recovery if the insured had taken his own life designedly while of sound mind, the general question was necessarily involved. The decision was that because the verdict established that Runk, the insured, had committed suicide while sane, his executor could not recover. The Supreme Court, speaking through Mr. Justice Harlan, held (at *p.* 160) that the death of the insured, "if directly and intentionally caused by .himself, when in sound mind, was not a risk intended to be covered, or which could legally have been covered, by the policies in suit."

Diligent research has led to a discovery of no other reported case directly adjudging that suicide will bar recovery upon a policy not excepting it in express terms (and not procured with the intention of committing suicide), except the later one of *Hopkins* v. *North Western Life Insurance Co.,* 95 *Fed. Rep.* 729, where a United States Circuit Court, being bound by the Ritter case, extended, and, I think, logically extended, the bar against recovery to a policy taken out by the insured for the benefit of his wife. The judgment was affirmed, however, upon other grounds. *Hopkins* v. *North Western Life Insurance Co.,* 99 *Id.* 199; 40 *C. C. A.* 1.

I will consider, first, the proposition that sane suicide, though unexcepted in express terms, is not a risk intended to be covered by a life insurance contract.

In the early life policies death by suicide was excepted from the liability of the insurer, and in some cases this was expressed to be so, whether the insured was sane or insane at the time of the act. In a note to the case of *Borradaile* v. *Hunter,* 5 *Man. & G.* 639, decided in the year 1843, there

appears a list of the varying forms of the exceptions as appearing in the policies customarily issued by eighteen of the leading companies of England. Adjudication in this country—contrary to that in England—that the condition of sanity was implied in a general exception of suicide led to the common expression in subsequent policies of a contrary intent; later, as such stringency was seen to be unwise, it was relaxed, and still later, as the outcome of contests over sanity showed any exception to be futile, and as such an exception discouraged insurance, it came to be omitted altogether, or made of very short duration.

The history of insurance makes difficult the argument that the exception is not now expressed, because necessarily implied. The contrary has been the course of evolution in the analogous case of death resulting as a punishment for crime. In an early English decision (*Fauntleroy's Case,* 4 *Bligh* (*N. S.*) 194 (1830), such a death was held to be an implied exception; but the effect of the raising of the question, notwithstanding its decision favorably to the insurer, was to lead to the general introduction into policies of an express exception. Chief Justice Brickell, of Alabama, was alive to this situation when he expressed a strong, though not deterrent, reluctance "to introduce, by construction or implication, exceptions into such contracts, which usually contain special exceptions." *Supreme Commandery* v. *Ainsworth, 71 Ala.* 436, 447.

Of course, the question is an open one, and the views of so influential a tribunal as the Supreme Court of the United States deserve most careful consideration. The reason for implying the exception is thus stated by Justice Harlan (169 *U. S.* 153) : "In the case of fire insurance it is well settled that although a policy in the usual form indemnifying against loss by fire may cover a loss attributable merely to the negligence or carelessness of the insured, unaffected by fraud or design, it will not cover a destruction of the property by the willful act of the assured himself in setting fire to it, not for the purpose of avoiding a peril of a worse kind, but with the intention of simply effecting its destruction.

Much more should it be held that it is not contemplated by a policy taken out by the person whose life is insured and stipulating for the payment of a named sum to himself, his executors, administrators or assigns, that the company should be liable if his death was intentionally caused by himself when in sound mind. When the policy is silent as to suicide, it is to be taken that the subject of insurance—that is, the life of the assured—shall not be intentionally and directly, with whatever motive, destroyed by him when in sound mind. To hold otherwise is to say that the occurrence of the event upon the happening of which the company undertook to pay was intended to be left to his option. This view is against the very essence of the contract."

The conclusion stated is a plain *non sequitur*. Suicide is only one of many ways that may determine the event of death. Insurance rates are based upon an average expectancy of life, derived from experience tables embracing suicide as well as all other causes of mortality. Many intelligent persons believe that suicide self-evinces a morbid state of mind, and insurers, in a large volume of business, may well offset the natural love of life against the infrequent impulse of self-destruction. The supposed analogy to other insurance is not new. In *Moore* v. *Woolsey*, 4 *El. & B.* 242, 254, Lord Campbell said, *obiter:* "If a man insures his life for a year and commits suicide within the year, his executors cannot recover on a policy, as the owner of a ship who insures her for a year cannot recover on the policy if, within the year, he causes her to be sunk." The reasoning is specious and the analogy is false. It is quite right that willful and unnecessary destruction of the subject of fire or marine insurance should, at the same time, destroy the insurer's liability. The courts, therefore, imply in such case an exception from the general terms of the contract, because that must have been intended. But the case of life insurance is not parallel. Strict insurance is indemnity. Voluntary and unnecessary destruction of the property insured is inconsistent with the basis of the contract; but the basis of that which, by a misnomer, is called insurance upon life is altogether different.

That is an arbitrary agreement to pay a fixed sum upon the happening of an inevitable event, to wit, the death of the insured, without regard to the value of his life or the loss sustained by the assured. That a contract of life insurance is not a contract of indemnity was decided in the Exchequer Chamber in 1854. *Dalby* v. *India and London Life Assurance Co.*, 15 *C. B.* 365, overruling *Godsall* v. *Boldero, 9 East* 72. There is no force in any argument derived from contracts of indemnity. Another reason, not expressly stated by Justice Harlan, but frequently assigned in judicial *dicta* for the implication declared by him, is that, without it, the insured would be deriving a benefit from his own wrongful act which will never be presumed to be within the intention of contracting parties. For example, recovery on a life insurance policy assigned by the insured to his creditor, who afterwards murdered him, has rightfully been denied. *New York Mutual Insurance Co.* v. *Armstrong*, 117 *U. S.* 59. Granting the inherent wrongfulness of suicide—which is matter for the moralist rather than the judge—this doctrine fails when applied thereto. No one can in this world derive a benefit from his own death. By that final event all earthly profit ends for him to whom it comes. He is for this life equally beyond gain and loss and, as to him, the rules that govern mundane intercourse become no longer applicable. Those who derive the benefit will have done no wrong. But it is said that suicide is a fraud on the insurer. To procure insurance with intent to commit suicide is a fraud on the insurer that should defeat recovery at the option of the insurer; and, with all the incidents of a rescission, will avoid the contract, even as against beneficiaries or assignees. *Smith* v. *National Benefit Society*, 123 *N. Y.* 85. But to argue that suicide, not previously intended, is such a fraud as to defeat recovery is to beg the very question of what is the contract; and the argument assumes that insurance rates are fixed upon a basis excluding death by suicide, while, as we have seen, the contrary must be the case, for the experience tables include all forms of death. Moreover, it would be next to impossible to fasten the fraudulent intent. The motives for suicide are difficult

to fathom, and are usually complex. In the case in hand Dr. Campbell doubtless took his life through overwhelming chagrin due to arrest on a criminal charge. It is highly improbable that he thought at all of his insurance. To submit to a jury in each case the intent of the act would be practically fruitless. A general imperative rule in all cases must be established, and such seems to be the view of Justice Harlan, for he says that intentional self-destruction, *with whatever motive*, is impliedly excepted from the contract.

As a mere matter of construction it is of no importance what rule is to govern future contracts; but, in view of the historical aspect of the subject, the reading into contracts of life insurance this unexpressed exception will be sure to work great hardship. Many policies are being carried by creditors, or others interested, without a formal assignment, or the possibility of compelling one, except by consent of the insurer. These persons have rightly felt secure against recklessness or malignity extending even to suicide, and their investments should not be imperiled.

Lastly to be considered is the proposition that intentional suicide, when in sound mind, is not a risk which can legally be covered by insurance. This rests upon a postulated public policy. Justice Harlan says: "A contract, the tendency of which is to endanger the public interests, or injuriously affect the public good, or which is subversive of sound morality, ought never to receive the sanction of a court of justice or be made the foundation of its judgment. If, therefore, a policy (taken out by a person whose life is insured and in which the sum named is made payable to himself, his executors, administrators or assigns) expressly provided for the payment of the sum stipulated when or if the assured, in sound mind, took his own life, the contract, even if not prohibited by statute, would be held to be against public policy, in that it tempted or encouraged the assured to commit suicide in order to make provision for those dependent upon him or to whom he was indebted." We are not concerned with an express contract to pay in case of suicide, but with a normal life insurance policy. Payment is to be made upon

the event of death, and the risk of death by suicide, as applied to the volume of insurance, is almost infinitesimal. The real question is whether it is against sound public policy for the insurer to assume the risk.

It is urged that parties may not contract for even a possible obligation resting on criminality. Doubtless such is the law. *Faunlleroy's Case, ubi supra,* rests upon that principle, and it has recent illustration in the State of Massachusetts, where the Supreme Court denied insurance because the death of an insured woman resulted from a criminal abortion. *Hatch v. Mutual Life Insurance Co.,* 120 *Mass.* 550. But suicide is not criminal in New Jersey. Punishment is of the essence of crime, and suicide is not punishable here. Blackstone defines a crime or misdemeanor to be "an act committed or omitted in violation of a public law either forbidding or commanding it." 4 *Bl. Com.* 5. A recent writer more tersely says: "A crime is an act of omission or commission punishable as an offence against the state." *McClain Crim. L.,* § 4. At common law suicide was both criminal and felonious, although the punishment, except that of anticipatory dread, was, of necessity, visited upon the innocent, unless insensate clay can be said to have been punished by the burial in the highway and the driven stake. But in this country, generally, there is neither forfeiture of goods nor other penalty attached to suicide, which is, therefore, "little more than the shadow of a crime." *Patterson v. National Premium Mutual Life Insurance Co.,* 100 *Wis.* 118. That case decides that suicide does not fall within the usual exception in a life insurance policy of death resulting from a violation of law. The opinion of Mr. Justice Winslow well merits study on all the phases of the subject now *sub judice.* It is a model of terse, logical reasoning, but like most judicial utterances since the Ritter case—which is evidently disapproved—it is confined to cases where the insurance is payable to a beneficiary. In New York also it has been held that death by suicide does not result from violation of law, although by an exclusive penal code an unsuccessful attempt to commit suicide is there a crime, while suicide is not. *Darrow v. Society, &c.,* 116 *N. Y.* 537.

In New Jersey neither suicide nor attempt to commit suicide has, since 1796 at least, been criminal. This results from the enactment in that year that no conviction or judgment for any offence against the state shall make or work forfeiture of estate. *Pat. L., p.* 221, § 78, continued to the latest revision of our Criminal Procedure act. *Pamph. L.* 1898, *p.* 919, § 153.

As to the abstract immorality of suicide generally, opinions may differ; but all will admit that in some cases it is ethically defensible. Else how could a man "lay down his life for his friend?" Suicide may be self-sacrifice, as when a woman slays herself to save her honor. Sometimes self-destruction, humanly speaking, is excusable, as when a man curtails by weeks or months the agony of an incurable disease. It will not do to resort to the argument that in such cases there is no "felonious intent." As to direct suicide, all that the common law required to make one a *felo de se* was that he should be of years of discretion, and in his senses, and should mean to kill himself. 4 *Bl. Com.* 189; *Hale P. C.* 411. Extenuation could only be considered by the king, who would "execute judgment in mercy." Justice Harlan has not yielded to this argument, for "with whatever motive" self-destruction is accomplished, it, in his view, defeats recovery. Inquiry into an intent—formed after procuring insurance—to defraud the insurer, by suicide, has seemed to me impracticable. Inquiry into any other evil intent seems just as impracticable. On whom would rest the burden of proof, and how could complex motives be unraveled? Some general rule must control this question of public policy. Cases cannot be individualized.

As to the public good requiring the discouragement of suicide, there may be also two opinions. The paternal theory of government does not here prevail. The common law condemned suicide, according to Hale and Blackstone, *ubi supra,* not only for religious reasons, but for the temporal one that the king has an interest in the preservation of all his subjects—and doubtless the same is true of an organized commonwealth and its citizens; but I cannot see that the public good is more concerned to prolong a life that may be worth-

less to the public than to secure to creditors their just demands, or to afford a maintenance to wife and children. Insurers may guard their interests in their contracts. I know no public policy more useful than that which holds contractors to performance.

That opinions of what is sound public policy upon this subject are not all alike is shown by that which has been declared in the great State of Missouri by its legislature. For many years no defence of suicide in a suit to collect life insurance has been permitted, unless it is shown to the satisfaction of the court or jury at the trial that the insured contemplated suicide at the time of application for the policy, and any contrary provision in a policy is made void. *Rev. Stat. (Mo.)* 1889, § 5855.

If it be public policy to interfere with contracts in order to discourage suicide, then ought the contract of a creditor insuring the life of his debtor, or a wife insuring the life of her husband, to be defeated by the suicide of the insured, for the same motive of self-destruction for the benefit of the assured will be impelling in such cases as in a case where the contract is directly with the insured; yet it has never been suggested that one having an insurable interest in another's life may not, at his own cost, himself contract insurance on that life, or take an assignment of an existing policy, without the risk of forfeiture by the suicide of the insured. Indeed, it has been held otherwise, even in England, where suicide is criminal. *Cook* v. *Black,* 1 *Hare* 390; *Moore* v. *Woolsey, ubi supra.* The fact that the insured pays the premiums and purchases insurance for a designated beneficiary, or for the benefit of his estate, can make no difference in his mental attitude. *He* can gain nothing by his death, and normally his estate will go either to his creditors or to his widow and next of kin. I see no sensible reason to affirm the contract in one case and disallow it in the other.

I have said that no adjudged case has permitted suicide as a defence against a beneficiary other than the insured. This is true, with one exception, even where the decision in the Ritter case has been recognized as sound or controlling.

Mr. Justice Harlan himself was very careful to go no farther than the case required. The exception to which I have alluded is the Hopkins case, above cited, but, to my mind, the extension in that case was logical. What difference does it make whether a man contracting insurance designates in the contract the beneficiary, or leaves that designation to the law, or his last will and testament? The contract is with him, and it is no more consistent with public policy that he should be allowed to contract that his suicide should not forfeit the right of a beneficiary, named in the policy to receive the insurance money, than that he should be allowed to contract that such suicide should not forfeit the right of those who otherwise would receive it as creditors, distributees or legatees of his estate. The decisions, since the Ritter case, denying suicide as a defence to silent policies, must, logically, either reprobate that case or distinguish it only on the ground that, as against a beneficiary named, the exception of the death of the insured by suicide cannot be constructively implied.

I conclude that in no case should the suicide of an insured person defeat recovery upon a contract of life insurance not procured by him with the intention of committing suicide, unless the contract so provides in express terms.

Presumably the contract in this case was consummated in New Jersey, but if we look to Maryland, the state of the defendant's incorporation, for the law which is to govern, it will be found no different. In a very recent decision of the Court of Appeals of that state, in a controversy with this same defendant, after full consideration of both the grounds of objection to recovery that I have been discussing, the same conclusion, and for substantially the same reasons, has been reached. *Supreme Conclave Improved Order of Heptasophs* v. *Miles,* 48 *Atl. Rep.* 845.

The direction of verdict for plaintiff was correct, and the judgment is affirmed.

GARRISON, J. (concurring).

The opinion of Mr. Justice Collins holds that to procure insurance with intent to commit suicide is a fraud on the

insurer that should defeat recovery, but that suicide with an intent to defraud the insurer, if formed after getting the insurance, is not such a fraud as should defeat recovery. I think that the same result should follow in either of the above instances of fraud. The burden of proving the fraudulent intent in either event is upon the insurer; this burden was not borne at the trial. My failure to concur in the opinion of the court, therefore, does not lead to my dissent from the judgment of affirmance pronounced by it.

VAN SYCKEL, J. (dissenting).

This is an action by Lillie Campbell, the beneficiary named in a certain benefit certificate issued by the plaintiff to her late husband, John G. Campbell, by virtue of his having become a member of the said supreme council, a fraternal organization, located in this state.

Neither the benefit certificate nor the by-laws of the order contained any provision whatever with reference to suicide.

On the trial of the cause there was testimony tending to show that John G. Campbell committed suicide, and also that he was irresponsible mentally at the time of his self-destruction.

At the conclusion of the testimony the court directed the jury to render a verdict for the plaintiff, although the defendant requested the court to charge the jury that if the said Campbell committed suicide while he was of sound mind, there should be a verdict for the defendant.

The bill of exceptions and the assignment of errors present the question whether the request of the defendant was properly refused.

Campbell named the plaintiff, who was his wife, as the beneficiary on the certificate, but he had the right, at any time, to change the beneficiary without her consent.

It seems clear, therefore, that the plaintiff had no vested interest in the certificate, and so the cases hold. *Masonic Mutual* v. *Burkhart*, 110 *Ind.* 189; *Hollenbery* v. *District No. 1*, 94 *N. Y.* 581; *Knights* v. *Watson*, 64 *N. H.* 517.

The case, therefore, turns upon the question whether the

plaintiff was entitled to a verdict if Campbell, while of sound mind, committed suicide.

In the recent case of *Ritter* v. *Mutual Life Insurance Co.,* reported in 169 *U. S.* 139, this question is discussed with much ability.

Mr. Justice Harlan, who delivered the opinion of the court, said:

"It is contended that the trial court erred in saying to the jury, as, in effect, it did, that intentional self-destruction, the assured being of sound mind, is, in itself, a defence to an action upon a life policy, even if such policy does not, in express words, declare that it shall be void in the event of self-destruction, when the assured is in sound mind. But is it not an implied condition of such a policy that the assured will not purposely, when in sound mind, take his own life, but will leave the event of his death to depend upon some cause other than willful, deliberate self-destruction? Looking at the nature and object of life insurance, can it be supposed to be within the contemplation of either party to the contract that the company shall be liable upon its promise to pay where the assured, in sound mind, by destroying his own life, intentionally precipitates the event upon the happening of which such liability was to arise?

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"If a person should apply for a policy expressly providing that the company should pay the sum named if, or in the event, the assured, at any time during the continuance of the contract, committed self-destruction, being at the same time of sound mind, it is reasonably certain that the application would be instantly rejected. It is impossible to suppose that an application of that character would be granted. If experience justifies this view, it would follow that a policy stipulating generally for the payment of the sum named in it upon the death of the assured, should not be interpreted as intended to cover the event of death caused directly and intentionally by self-destruction, whilst the assured was of sound mind, but only death occurring in the ordinary course

of life.  *  *  *  In the case of fire insurance it is well settled that, although a policy in the usual form, indemnifying against loss by fire, may cover a loss attributable merely to negligence or carelessness of the insured, unaffected by fraud or design, it will not cover a destruction of the property by the willful act of the assured himself in setting fire to it, not for the purpose of avoiding a peril of a worse kind, but with the intention of simply effecting its destruction. Much more should it be held that it is not contemplated by a policy taken out by the person whose life is insured, stipulating for the payment of a named sum to himself, his executors, administrators or assigns, that the company should be liable if his death was intentionally caused by himself when in sound mind. When the policy is silent as to suicide, it is to be taken that the subject of the insurance—that is, the life of the assured—shall not be intentionally and directly, with whatever motive, destroyed by him when in sound mind. To hold otherwise is to say that the occurrence of the event, upon the happening of which the company undertook to pay, was to be left to his option. That view is against the very essence of the contract.

"There is another consideration supporting the contention that death intentionally caused by the act of the assured, when in sound mind, the policy being silent as to suicide, is not to be deemed to have been within the contemplation of the parties—that is, that a different view would attribute to them a purpose to make a contract that could not be enforced without injury to the public. A contract, the tendency of which is to endanger the public interests, or injuriously affect the public good, or which is subversive of sound morality, ought never to receive the sanction of a court of justice, or be made the foundation of its judgment.

"If, therefore, a policy, taken out by a person whose life is insured and in which the sum named is made payable to himself, his executors, administrators or assigns, expressly provided for the payment of the sum stipulated when or if the assured, in sound mind, took his own life, the contract, even if not prohibited by statute, would be held to be against

public policy, in that it tempted or encouraged the assured to commit suicide in order to make provision for those dependent upon him or to whom he was indebted.

"Is the case any different in principle, if such policy is silent as to suicide, and the event insured against—the death of the assured—is brought about by his willful, deliberate act when in sound mind?"

Mr. Justice Harlan fortifies his conclusions by reference to many cases cited and discussed in his opinion.

I concur in the views he has so forcibly expressed.

Death, in its commonly understood acceptation, does not include death by one's own hand. Additional words must be used to convey the fact that it was death by self-destruction.

It is not necessary for the defence in this case to import additional words into this contract, or in any respect add to its terms.

In property insurance the recognized defence that the assured willfully set fire to the subject of the insurance, does not write any new condition in the policy. Its correct construction, as written, forbids recovery upon it.

So the reasonable and just interpretation of the language used in the benefit certificate in this case precludes the idea that the death of Campbell, by his own hand, while of sound mind, was the death to which the insurance applied.

Such insurance, if expressed in the certificate, I think could not be a legal basis of action, and if unexpressed, it can have no greater legal value.

In my judgment the Ritter case was decided in accordance with the correct rules of interpretation and with well-recognized legal principles.

It is a general rule that a man cannot make a profit or gain an advantage by his own wrongful act, and a right of action to a third person who had no vested interest in the contract should not be permitted to arise out of the wrongful act of the insured.

Recovery in this case is, to some extent, an encouragement of suicide.

My conclusion is that the questions whether the assured

committed suicide, and whether he was of sound mind at the time, should have been submitted to the jury.

The trial court erred in directing a verdict for the plaintiff, and therefore the judgment should be reversed.

The judges who voted to reverse concur in this opinion.

*For affirmance*—DIXON, GARRISON, COLLINS, FORT, GARRETSON, BOGERT, KRUEGER, VREDENBURGH, VOORHEES.    9.

*For reversal*—THE CHANCELLOR, VAN SYCKEL, GUMMERE, HENDRICKSON, ADAMS, VROOM.    6.