## 11461

### WEEKS v. NEW YORK LIFE INS. CO.

#### (122 S. E., 586)

1. INSURANCE—LEGAL EXECUTION OF INSURED NO DEFENSE TO ACTION
ON LIFE POLICY CONTAINING INCONTESTABILITY CLAUSE.—The legal
execution of insured for a crime committed by him is no defense
to an action on a life policy which had been in force more than two
years, fixed by an incontestability clause, in view of Const. 1895,
Art. 1, § 8, providing that no conviction shall work a forefeiture,
and Civ. Code 1922, §§ 4100, 4101; recovery not being contrary to
public policy.

2. CONTRACTS—"PUBLIC POLICY" DEFINED.—"Public policy" imports
something that is uncertain, fluctuating, varying with the changing
economic needs, social customs, and moral aspirations of the peo-
ple. A state has no public policy cognizable by the Courts which is
not derivable by clear implication from established law as found
in its Constitution, statutes, and judicial decisions.

3. EVIDENCE—COMMON KNOWLEDGE THAT INSURANCE EXPERIENCE
TABLES EMBRACES DEATH BY LEGAL EXECUTION.—It is common
knowledge that insurance rates are based on an average expectancy
of life, derived from experience tables which embrace death by
legal execution as well as all other causes of mortality.

Before FEATHERSTONE, J., Orangeburg, 1922. Af-
firmed.

Action by W. G. Weeks against the New York Life In-
surance Company. Judgment for plaintiff, and defendant
appeals.

Note: On effect of execution of insured for crime on right to recover
life or accident policy, see notes in 14 L. R. A. (N. S.), 356, and L. R. A,.
1918A, 898.

On incontestable clause in insurance policy as excluding a defense
based upon public policy, see notes in 6 A. L. R., 448, and 13 A. L. R.,
674.

*Messrs. Thomas & Lumpkin,* for appellant, cite: *Criminal act of the assured:* 47 Law Ed. (U. S., 219). *Public policy:* Sub Division L., Act·1, Cons. of S. C., 56 Law Ed. U. S., 424; N. C. 1918-A, L. R. A., 896; 20 Pitt. Law Journal, 111; 46 Am. Rep., 332; 1918-A, L. R. A., 899; 1830, 4th Bligh N. R., 194; 42 Law Ed. U. S., 97; Note 14 L. R. A. (N. S.), 356; 117 U. S., 591. *Incontestable clause:* 23 A. E. Enc. of Law, 455; 15 A. & E. Enc. of Law, 927; Cooley's Briefs Law of Ins., Vol. 1, 542; Joyce on Ins., Vol. 4, Sec. 2506; 12 S. C., 839; 17 S. W., 646; 51 L. R. A., 889; 57 L. R. A., 318; 9 L. R. A. (N. S.), 1014; 35 L. R. A., 309; 93 N. W., 389; 96 Pac., 893; 6 R. C. L., 707–51. *Beneficiary of murderer cannot collect the proceeds of the policy:* 15 L. R. A., 141; 1917-B L. R. A., 1213; 117 U. S., 591; 169 U. S., 139; 115 Pac., 169; 263 Fed., 764. *Party to contract not estopped to claim public policy rule:* 10 R. C. L., 101, Note 3; 99 Am. Dec., 365; 37 N. E., 158; 49 N. E., 592; 148 N. W., 858; 109 N. W., 381; 25 N. E., 493; 33 S. E., 382; 62 Pac., 145; 67 Pac., 381. *Rules of public policy governing insurance contracts:* Cooley's Briefs, Vol. 1, pages 251, 545, 546, 549; Vol. 4, 3152, 3153.

*Messrs. Wolfe & Berry* and *M. M. Mann,* for respondent, cite: *General policy of the State:* Code 1922, Secs. 4100, 4101. *No conviction shall work corruption of blood or forfeiture of estate:* Sec. 8, Art. 1, Cons. of S. C.; R. C. L., 1227; 13 Am. Cases (Ill.), 129. *Policies are South Carolina contracts and governed by laws of this State:* 84 S. C., 253. *Public policy regarding insurance policies is a matter for the state to decide:* 254 U. S., 96.

April 15, 1924.

The opinion of the Court was delivered by Mr. Justice Marion.

The plaintiff recovered in an action upon two insurance policies for $1,000.00 each, issued by the defendant appellant, March 4, 1919, upon the life of Harvey Whaley. On February 20, 1920, the policies were duly assigned for value to the plaintiff-respondent, a creditor of the insured, to secure the payment of an indebtedness amounting at the time of the trial on circuit, to more than $2,000.00. The insured, Whaley, was convicted by a Court of competent jurisdiction of the murder of one Walford, and pursuant to a sentence of death imposed by that Court was electrocuted by officers of the law on November 4, 1921. The policies are ordinary life insurance policies, and each contains the following clause:

"This policy is free of conditions as to residence, travel, occupation and military and naval service, and shall be incontestable after two years in force, from date of issue, except for nonpayment of premium."

It is admitted that all premiums were duly paid, that the company accepted payment of premiums after the conviction of the insured; and that the policies had been in force for more than two years from date of issue and "for more than two years before the alleged homicide had been committed."

The defendant resisted recovery upon the ground that the policies were null and void, in that the death of the insured was "brought about by sentence of law for crime committed by the insured." That defense was predicated, not upon any condition or stipulation of the contract, but solely and expressly upon the proposition that it would be against public policy to permit or require the payment of a policy of life insurance where the death of the insured was the result of his legal execution. The appeal raises, substantially, the one question of whether that defense should be sustained.

Whether the legal execution of the insured for a crime committed by him constitutes a valid defense to an action

upon a life insurance policy is an interesting question of novel impression in this State. Resting their decision expressly upon grounds of public policy, a number of Courts of high standing, including the Supreme Court of the United States, have sustained such defense. *Amicable Society v. Bolland,* 4 Bligh N. S., 194; 5 Eng. Rep. (Reprint), 75. *Burt v. Union Central Life Insurance Co.,* 187 U. S., 362; 23 Sup. Ct., 139; 47 L. Ed., 216, affirming 105 Fed., 419; 44 C. C. A., 548; 59 L. R. A., 393. *Northwestern Mutual Life Insurance Co. v. McCue,* 223 U. S., 234; 32 Sup. Ct., 220; 56 L. Ed., 419, 423; 38 L. R. A. (N. S.), 57. *Collins v. Metropolitan Life Insurance Co.,* 27 Pa. Super. Ct., 353. *Scarborough v. American National Insurance Co.,* 171 N. C., 353; 88 S. E., 482; Ann. Cas. 1917D, 1181; L. R. A. 1918A, 896. Other reputable Courts have reached a contrary conclusion. *Collins v. Metropolitan Life Insurance Co.,* 232 Ill., 37; 83 N. E., 542; 14 L. R. A. (N. S.), 356; 122 Am. St. Rep., 54; 13 Ann. Cas., 129. *Fields v. Metropolitan Life Insurance Co.* (Tenn.), 249 S. W., 798. *American National Insurance Co. v. Coates et al.* (Tex. Com. App.), 246 S. W., 356. *Weil v. Travelers' Insurance Co.,* 201 Ala., 409; 78 South., 528; Id., 16 Ala. App., 641; 80 South., 348, and see *Supreme Lodge, K. P., v. Overton,* 203 Ala., 196; 82 South., 443; 16 A. L. R., 649.

The public policy which must be relied on to avoid the contracts in suit is the public policy of South Carolina. The insurance policies are South Carolina contracts (*Northwestern Mutual Life Insurance Co. v. McCue, supra*), and the question is, therefore, one to be determined by our own local rules of public policy (*Northwestern Mutual Life Insurance Co. v. Johnson,* 254 U. S., 96; 41 Sup. Ct., 47; 65 L. Ed., 155).

Public policy has been aptly described by one of our Judges as "a wide domain of shifting sands." Gage, J., in *McKendree v. Southern States Life Insurance*

*Co.,* 112 S. C., 335; 99 S. E., 806. The term in itself imports something that is uncertain and fluctuating, varying, with the changing economic needs, social customs, and moral aspirations of a people. Story on Contracts (5th Ed.), § 675; 23 A. & E. Ency. (2d Ed.), 456. For that reason it has frequently been said that the expressive public policy is not susceptible of exact definition. But for purposes of juridical application it may be regarded as well settled that a State has no public policy, properly cognizable by the Courts, which is not derived or derivable by clear implication from the established law of the State, as found in its Constitution, statutes, and judicial decisions. *People v. Hawkins,* 157 N. Y., 12; 51 N. E., 257; 42 L. R. A., 490; 68 Am. St. Rep., 736. *Magee v. O'Neill,* 19 S. C., 185; 45 Am. Rep., 765. Hence since, as was well said by Mr. Justice McGowan in *Magee v. O'Neill, supra—*

"It is the duty of the Legislature to make laws and of the Court to expound them, * * * the subjects in which the Court undertakes to make the law by mere declaration [of public policy] should not be increased in number without the clearest reasons and the most pressing necessity."

The imperative reasons of policy upon which appellant relies to avoid the contracts here in question are thus stated in the leading case of *Amicable Society v. Bolland, supra:*

"Suppose that in the policy itself this risk had been insured against; that is, that the party insuring had agreed to pay a sum of money year by year, upon condition that, in the event of his committing a capital felony, and being tried, convicted and executed for that felony, his assignees shall receive a certain sum of money—is it possible that such a contract could be sustained? Is it not void upon the plainest principles of public policy? Would not such a contract (if available) take away one of those restraints operating on the minds of men against the commission of crimes—namely, the interest we have in the welfare and prosperity of our

connections? Now, if a policy of that description, with such
a form of condition inserted in it in express terms, cannot on
grounds of public policy be sustained, how is it to be con-
tended that in a policy expressed in such terms as the present,
and after the events which have happened, that we can sus-
tain such a claim? Can we, in considering this policy, give
to it the effect of that insertion, which if expressed in terms
would have rendered the policy, as far as that condition went
at least, altogether void?"

That view was approved and adopted by the Supreme
Court of the United States in *Burt v. Union Central Life
Insurance Co., supra* (Brewer, A. J.). The *Burt Case* was
followed in *Northwestern Mutual Life Insurance Co. v.
McCue, supra,* and the reasoning upon which it was rested is
thus restated by Mr. Justice McKenna in the *McCue Case:*

"The question was before this Court in *Burt v. Union
Central Life Insurance Co.,* 187 U. S., 362; 47 L. Ed., 216;
23 Sup. Ct. Rep., 139. In the policy passed on, as in the
policy in the case at bar, there was no provision excluding
death by the law. It was decided, however, that such must
be considered its effect, though the policy contained nothing
covering such contingency. These direct questions were
asked: 'Do insurance policies insure against crime? Is that
a risk which enters into and becomes a part of the contract?'
And answering, after discussion, we said: 'It cannot be that
one of the risks covered by a contract of insurance is the
crime of the insured. There is an implied obligation on his
part to do nothing to wrongfully accelerate the maturity of
the policy. Public policy forbids the insertion in a contract
of a condition which would tend to induce crime, and, as it
forbids the introduction of such a stipulation, it also forbids
the enforcement of a contract under the circumstances which
cannot be lawfully stipulated for.' Cases were cited, among
others, *Ritter v. Mutual Life Insurance Co.,* 169 U. S., 139;
42 L. Ed., 603; 18 Sup. Ct. Rep., 300. There it was held

that a life insurance policy taken out by the insured for the benefit of his estate was avoided when one of sound mind intentionally took his life, irrespective of the question whether there was a stipulation in the policy or not. And the conclusion was based, among other considerations,, upon public policy, the Court saying that 'a contract, the tendency of which is to endanger the public interests· or injuriously affect the public good, or which is subversive of sound morality, ought never to receive the sanction of a Court of justice, or be made the foundation of its judgment.' "

The State Courts which have followed the foregoing cases have added nothing substantial to the reasoning there employed.

Upon analysis, it will be seen that the rationale of those decisions is rested upon the postulates (1) that an express contract to insure against death by legal execution would contravene public policy in that such a contract would remove one of the restraints operating against the commission of crime; (2) that the validity of the insurer's obligation upon an ordinary life policy is to be determined by the test of whether the risk of death by crime could have. been expressly assumed in the policy; and (3) that sound public policy requires an implied obligation on the part of the insured "to do nothing to wrongfully accelerate the maturity of the policy," and, as a corollary, reads into the policy contract the implied condition that death by legal execution is not one of the risks assumed by the insurer.

The position embraced within the first two postulates, viz., that because an express contract to insure against death by legal execution would contravene public · policy, an ordinary life policy which does not except death from such a cause should be declared unenforceable on grounds of public policy, is, we think, clearly untenable. An express agreement that, in the event of death by legal execution, the insurer would pay a stipulated sum to the criminal's estate or beneficiaries, might be considered to evidence a

design on the part of the insured, participated in by the insurer, to free the insured from such inhibition of his will to commit crime as might otherwise exist, and, where death by legal execution has ensued warrant the inference that the crime was to an extent, superinduced by the contract. But where one takes out an ordinary life insurance policy, to be matured by death from any cause, no basis in reason or experience exists for assuming that the insured had any intent at the time of making the contract to accelerate the maturity of the policy by committing a capital crime and suffering the death penalty. So negligible is the possibility of any such design or intent on the part of an insured that insurance companies, as in the contracts here in question, now incorporate no express condition, as was formerly quite generally done, against death for crime. As has been well said, "the history of insurance makes difficult the argument that the exception is not now expressed because necessarily implied." Collins, J., in *Campbell v. Supreme Conclave, etc.,* 66 N. J. Law, 274; 49 Atl., 550; 54 L. R. A., 576. The effect of the raising of the question in *Amicable Society v. Bolland, supra,* notwithstanding the decision favorable to the insurer, was, as pointed out in the *Campbell Case,* "to lead to the general introduction into policies of an express exception." In the absence, therefore, of an express agreement to insure against death for crime, certainly it would seem no intent or design to accelerate the maturity of the ordinary life insurance policy by committing a capital crime and inviting legal execution therefor is to be attributed to the insured at the time of the making of the contract. On the other hand, in the absence of an express stipulation in the policy excepting death by legal execution, no intent in fact to exclude death from that cause may fairly be claimed by the insurance company. Where such a contract has thus been entered into, the real question, therefore, is, Does sound public policy require

that the Courts write into the policy the condition that death by legal execution is excepted?

If so, in the aspect of the subject we are now considering, it should clearly appear that enforcement of the contract in accordance with its terms would tend to promote crime. Granting that, conceivably, to the holder of a life insurance policy who contemplates commission of a capital crime, the consideration that his insurance would not be paid if he were legally executed, might be a deterring influence, what certain or substantial basis exists for a conclusion that the volume of crime would be appreciably, if at all, diminished by writing that condition into all life insurance policies? We know of none to be found either in the history of insurance or of the criminal law. Certainly, to indulge the surmises that a forfeiture of life insurance would add any element of potency to the inhibition already imposed upon the criminal will by the electric chair and the hangman's noose, would seem clearly to trench upon the fanciful and speculative, or, as expressed from another angle by the Illinois Court (*Collins v. Metropolitan Life Insurance Co., supra*):

" * * * It is said to be contrary to public policy to require the company to pay, lest by so doing it lend encouragement to other policyholders to seek murder, and execution therefor, in order that their estates or heirs might profit thereby. * * * This contention seems to border closely on the absurd."

But, even if there were substantial basis for the view that enforcement of such contracts would tend to encourage crime, there are considerations which would seem clearly to make the question of public policy involved one for the decision of the legislative department of government and not of the judicial. Life insurance, under modern social and economic conditions, has become a business which in a very real sense is impressed with a public interest. It is "an important factor in the commercial and social life of our

16—S. C. R., 128.

people." There can be no doubt that the purposes sub-
served and ends accomplished by life insurance in protecting
the credit of business men, in preventing the waste and
sacrifice of estates, and in providing for dependent ones,
are purposes and ends in which the State is deeply concerned.
There is a substantial relation between the stimulation and
protection of commerce, the conservation of the fruits of in-
dustry, provision for the material needs of dependent chil-
dren, etc., and the public good. Hence, where a life insur-
ance policy has been matured by the legal execution of the
insured, the consideration having to do with the removal
of temptation to, or restraint upon, crime among policy-
holders is not the only one with which the State is concerned.
Over against the public good to be subserved by avoiding
the policy contract, upon the somewhat tenuous theory that
such forfeiture would tend to discourage the commission
of capital crimes, is to be set the public good to be promoted
by requiring payment of the insurance to the end that cred-
itors be protected, commercial transactions safeguarded, and
dependent women and children provided with the material
necessities of life. Certainly, the interest of the State in
saving the dependents of an executed criminal from becoming
a charge upon public charity or from having to seek a live-
lihood under conditions of poverty and degradation, calcu-
lated to make them an economic liability or a social and
civil menace, is sufficiently obvious. It would seem equally
obvious that the task of balancing considerations of that
character is peculiarly within the province of the makers of
the organic and statute law of the State, and that, in the ab-
sence of a definite expression from the lawmaking power the
subject is one in regard to which no clear reason or pressing
necessity exists for the Courts to make the law by declaring
a rule of public policy.

Certainly, no such clear reason or necessity is to be de-
duced by necessary implication from the Constitution, stat-
utes, or judicial decisions of this State. On the contrary,

to forbid the enforcement of a contract of life insurance, matured by the legal execution of the insured, upon the ground that to permit payment of the insurance in such a case would remove a restraint upon and tend to promote crime would seem clearly to run counter to an unequivocal declaration of public policy contained in our organic law. Section 8, Art. 1, of the Constitution of 1895, provides:

"No bill of attainder, *ex post facto* law, law impairing the obligation of contracts * * * shall be passed, and no conviction shall work corruption of blood or forfeiture of estate."

That expression, carried forward from the Constitution of 1868 (Article 1, § 21) represents a very definite abandonment and disapproval of the ancient doctrine of the English criminal law that conviction for crime should work corruption of blood or forfeiture of property rights. The policy thus enunciated is further impliedly recognized and confirmed by our statute of distributions providing for the descent of property in cases of intestacy and by our statute of wills conferring a general power of disposition of property by will. "In none of these statutes is the right conferred in respect to property made to depend upon the manner or cause of death to the owner." Obviously, to hold that the real and personal property of Whaley who died in the electric chair was not subject to the same law of descent and devise as property generally would be to ingraft by judicial legislation exceptions in these statutes where none exist. Why should his life insurance contract be forfeited? That the argument in favor of declaring void a policy of insurance upon the life of one executed for crime for the reason that it would tend to discourage crime rests upon the same ground urged centuries ago in support of the now obsolete doctrine of attainder and corruption of blood would seem sufficiently apparent. For an interesting discussion and convincing demonstration of that proposition, reference may be had to the able opinion of Judge Vickers in the case of *Col-*

*lins v. Metropolitan Life Insurance Company, supra.* In that case the Court, applying a constitutional provision similar to ours, announced this view:

"An insurance policy payable to the estate or personal representatives of the insured is a species of property. It is in the nature of a chose in action, which, subject to certain conditions, varying according to the terms of the contract, is payable upon the contingency of death or at a stated time. * * * The amount of insurance carried is approximately $1,000,000,000. Why should this enormous property interest be subject to any different conditions than those applying to any other property owned by the people? If a man who is executed for crime has at his death $1,000 in real estate, $1,000 in chattels, and $1,000 life insurance payable to his estate, his real estate descends to his heir and his personal chattels to his administrator, but the $1,000 life insurance must be left in the hands of the company who has received the premiums because it is said to be contrary to public policy to require the company to pay. * * * We know of no rule of public policy in this State that will enforce this species of forfeiture, but there is a rule of law which has often been applied when two parties make a valid contract and the same has been completely performed by one party and nothing remains except the performance by the other, which will compel performance or award damages for the default against the delinquent party."

It is further pointed out in the *Collins Case* that *Amicable Society v. Bolland, supra,* which has been followed by such of the Courts of this country as have reached the opposite conclusion, was decided by the House of Lords in 1830, and that at that time forfeitures for the commission of crime were enforced in England and continued to be until abolished by 33 and 34 Vic. in 1870. A decision so obviously predicated upon a doctrine which has never obtained in this country is, we think, wholly without pertinent force as authority. We are, therefore, of the opinion that, as to this

phase of the subject, the conclusion reached by the Illinois Court in the *Collins Case,* and followed by the Tennessee (*Fields v. Insurance Co., supra*), and Texas (*American Nat. Insurance Co. v. Coates et al.*) Courts is clearly sound. See note 14 L. R. A. (N. S.), 357.

We come now to the proposition that sound public policy requires that the Courts read into all life insurance contracts the implied obligation on the part of the insured "to do nothing to wrongfully accelerate the maturity of the policy," and, as a corollary, the implied condition that death for crime is not one of the risks assumed by the insurer (*Burt and McCue Cases*). The argument for reading that implied condition into an ordinary life policy is based largely upon a supposed analogy to other insurance. As to that analogy the New Jersey Court in a suicide case (*Campbell v. Supreme Conclave Improved Order Heptasophs,* 66 N. J. Law, 274; 49 Atl., 550; 54 L. R. A., 576), says:

"The reasoning is specious and the analogy is false. It is quite right that willful and unnecessary destruction of the subject of fire or marine insurance should at the same time destroy the insurer's liability. The Courts, therefore, imply in such a case an exception from the general terms of the contract, because that must have been intended. But the case of life insurance is not parallel. Strict insurance is indemnity. Voluntary and unnecessary destruction of the property insured is inconsistent with the basis of the contract, but the basis of that which by a misnomer is called 'insurance upon life' is altogether different. That is an arbitrary agreement to pay a fixed sum upon the happening of an inevitable event, to wit, that death of the insured, without regard to the value of his life or the loss sustained by the assured. That a contract of life insurance is not a contract of indemnity was decided in the Exchequer Chamber in 1854. *Dalby v. India & L. Life Assurance Co.,* 15 C. B., 365, overruling *Godsall v. Boldero,* 9 East,

72.   There is no force in any argument derived from contracts of indemnity."

The opinion of Judge Collins in the *Campbell Case* is a model of terse, cogent reasoning, and well merits study upon all phases of the subject now under consideration.   Another reason suggested for such an implied condition in a life policy is that without it the insured, executed for crime, would derive "a benefit from his own wrongful act which will never be presumed to be within the contemplation of contracting parties."   There would seem to be little if any basis in fact for that argument.   Payment of the policy can bring no profit to, and confer no earthly benefit upon, the dead man who committed the crime.   "Those who derive the benefit will have done no wrong."

It is quite evident that the foregoing and like considerations for implying the condition that a life policy excepts death for crime rest upon the broad assumption that such a death constitutes a fraud on the insurer.   There might be adequate basis for that assumption if the policy were in fact procured with the intent to commit a felony and suffer the death penalty.   But here, as in all cases of contract, fraudulent intent, certainly, may not be presumed.   We have a contract, valid in its inception and valid up to the moment of the insured's death by legal execution.   In what way does such a death work a fraud upon the insurer?   The only way, apparently, such fraud could be wrought would be in and through causing the insurer to fulfill a contract for which the consideration had failed. In order to find such failure of consideration it is patently necessary to assume that the insurance rates, in consideration of the payment of which the company contracted its liability, were fixed upon a basis excluding death by legal execution. Such assumption, we think, is wholly unwarranted.   The insurance company expressly agrees that its obligation shall be matured by death.   The absence of an express inception in the contract formulated by the insurer, is not unfairly sus-

ceptible of the inference that the rates prescribed and collected were fixed on a basis which included the possibility of death by legal execution.   As a matter of common knowledge such rates are based upon an average expectancy of life derived from experience tables which embrace death by legal execution, as well as all other causes of mortality. See reference in our statute law to the American Experience Table, 3 Code 1922, § 4148.   If so, payment of a policy matured by death from legal execution would work no greater hardship or fraud upon the insurance company than payment of a policy where death is caused by a stroke of lightning.   We can perceive no subtsantial basis for the view that the law should write this implied exception into an ordinary life policy in order to protect the insurance com-pany from a fraud against which it has already protected itself through its rates, or against which it could have amply protected itself by express stipulation.

But, even if it be conceded that to enforce payment where death results from legal execution would work a fraud upon the insurer, the insurance company, by the general terms of the contracts here in suit, not only assumed that risk, but expressly agreed that the policies should be "incontestable after two years in force."   The real question, therefore, in this aspect of the subject, is whether it is against sound public policy for the insurer to assume this particular risk of being defrauded.   If so, it would seem to be equally against sound policy to permit the insurer to agree to waive the fraud when perpetrated.   That it is not in contravention of the public policy of this State to permit insurance companies to waive the defense of fraud generally is very clearly evidenced by our statute law and judicial decisions.   Indeed, by statute it is expressly provided that where premiums shall have been paid for the space of two years, any right on the part of the insurer to dispute the truth of the application or to claim that the insured had made false representations shall be deemed waived.   Section 4100, 3 Code 1922.   The

right to bring suit to cancel the policy on account of false representations is limited to two years. Section 4101, Vol. 3, Code 1922. We have expressly held that a stipulation that the policy should be incontestable after one year is valid. *Philadelphia Life Insurance Company v. Arnold,* 97 S. C., 418; 81 S. E., 964; Ann. Cas. 1916C, 706. We have further held that a provision that the policy should be incontestable from date was valid and did not contravene public policy upon the ground that it was a contract to waive or assume the risk of fraud. *McKendree v. Southern Life Insurance Co.,* 112 S. C., 335; 99 S. E., 806. In the Alabama case of *Weil v. Travelers' Insurance Co., supra,* where the defense was the legal execution of the insured, the Court held, on the authority of *Mutual Life Insurance Co., etc., v. Lovejoy,* 201 Ala., 337; 78 South., 299; L. R. A. 1918D, 860, a suicide case, that the incontestable clause was valid and applicable to the defense interposed.

If the insurance company may lawfully contract to waive or to assume the risk of fraud on the part of the insured in procuring the contract, effective from the date of the contract or after a · specified period of time from the date thereof, we see no reason why it may not lawfully contract to assume the risk or waive the defense of the insured's fraud in wrongfully maturing the contract. Certainly, the established law of the State as declared in our statutes and decisions may not soundly be interpreted to require that the incontestable clause, as applied to such a defense, should be pronounced invalid on the ground of public policy, that its application and enforcement would permit a fraud to be perpetrated on the insurance company. See collation of authorities, 6 A. L. R., 448–456, and 13 A. L. R., 674, 675. If death by legal execution works a fraud on the insurer, certainly the criminal act of a sane person in wrongfully maturing the policy by suicide would work an even more palpable fraud. And yet the incontestable clause in cases of suicide has been almost universally upheld by the Courts

against attacks upon the ground of public policy; the Supreme Court of the United States, in the comparatively recent case of *Northwestern Mutual Life Insurance Co. v. Johnson, supra,* saying:

"The object of the clause is plain and laudable—to create an absolute assurance of the benefit, as free as may be from any dispute of fact except the fact of death, and as soon as it reasonably can be done. * * * The state decisions, so far as we know, have upheld it. Unless it appears that the state concerned adopts a different attitude we should uphold it here."

If the insurer may, by virtue of this incontestable clause or otherwise, lawfully contract to assume the risk of the insured's suicide, he may in like manner lewfully contract to assume the risk of the insured's death by legal execution. And we so hold.

The judgment of the Circuit Court is affirmed.

MESSRS. JUSTICES WATTS, FRASER and COTHRAN concur.

MR. CHIEF JUSTICE GARY did not participate.