13595

SOUTH CAROLINA STATE BANK, RECEIVER, v. STOKES

(168 S. E., 541)

174

September, 1931.

178

*Mr. E. H. Henderson,* for appellant,

*Messrs. Kearse & Kearse,* for respondent,

March 7, 1933.

The opinion of the Court was delivered by MR. ACTING ASSOCIATE JUSTICE G. B. GREENE.

This action was brought by South Carolina State Bank, as receiver for Bamberg Banking Company, in liquidation, against the respondent, J. W. Stokes, for the purpose of recovering from him the sum of $500.00, which he as a depositor had withdrawn from said Bamberg Banking Company on the last day that said bank was open for business. The complaint in substance alleged that Bamberg Banking Company, hereinafter called the bank, was insolvent at the time of said withdrawal; that in making payment to respondent of said sum of money the bank intended to give respondent an unlawful preference over its other depositors and creditors; that respondent had reasonable cause to believe that said bank was insolvent, and that said payment to him would be an unlawful preference over the other creditors of the bank. The answer admitted the withdrawal by respondent of the sum of $500.00 from the bank on January 15, 1931, the last day the bank was open for business, but alleged that said sum of money was withdrawn from his open checking account while the bank was open and receiving deposits and paying checks in the usual course of its business, and while said bank was solvent. All other allegations of the complaint were denied.

The cause was referred to the master for Bamberg County, who took testimony and made a lengthy report of his findings and conclusions, all of these being adverse to the contention of appellant. Upon exceptions filed to the master's report the matter was heard before Honorable E. C. Dennis, presiding Judge, who signed an order on April 27, 1932, affirming the report of the master in every respect, except as to the finding by the master that the bank was solvent at the time payment was made to respondent. The Circuit Judge did not deem it necessary for him to pass upon that question.

From the order of the Circuit Judge, appellant appeals to this Court upon numerous exceptions. These exceptions, however, when properly grouped present for consideration by this Court four questions: (1) Was the bank insolvent at the time of said withdrawal by respondent? (2) Did the bank intend to give a preference to respondent? (3) Did respondent have reason to believe that the bank was insolvent and that the payment to him would constitute a preference over the other depositors and creditors of the bank? (4) Did the bank give and did respondent receive an unlawful preference over the other creditors of the bank?

Taking up these four questions in their order, let us inquire whether the bank was insolvent at the time said payment was made to respondent. There can ne no doubt that it was found to be insolvent after the closing of its doors. A receiver was appointed and liquidation of its affairs ordered; the receiver appraised its assets at about $102,000.00, while its debts amounted to more than $150,-000.00; a stockholders' liability suit was ordered and brought; and at the time the case was heard by the master only 10 per cent. in dividends had been paid from the general assets of the corporation. The receiver's cashier testified before the master as follows: "There is no possibility of the bank being able to pay its debts, in full; all the assets are frozen. There is a bunch of real estate which is of no value. Some rather large losses have resulted already. * * * I don't believe that the stock liability, plus the collections from the assets * * * will ever be able to pay the debts in full." It is argued by respondent that the present insolvency of the bank is due to the fact that after closing its doors its assets "shrank over night," and that many of the heavy losses ascertained by the receiver are the inevitable result of closing its doors. Let us see then if at the time of said withdrawal the bank was insolvent within the meaning of the term "insolvency," as defined by this Court:

"A bank is insolvent when, from the uncertainty of being able to realize on its assets, in a reasonable time, a sufficient amount to meet its liabilities, it becomes necessary for the control of its affairs to pass out of its hands." *Ex parte Berger,* 81 S. C., at age 250, 62 S. E., 249, 252, 22 L. R. A. (N. S.), 445; *Harlem Corp. v. Eadie,* 152 S. C., at page 264, 149 S. E., 401; *Chandler v. Abney et al.,* 166 S. C., 527, 165 S. E., 190.

"It is a matter of common knowledge that a bank may be theoretically entirely solvent and be subject to a condition of panic among its depositors which brings about the condition referred to in the *Berger case.*" *Harlem Corp. v. Eadie,* 152 S. C., at page 264, 149 S. E., 401, 408.

On the morning of January 13, 1931, the bank had cash on hand amounting to $20,000.00. At the same time there was due it from banks and bankers the sum of about $65,-000.00. On the morning of January 14, these figures were practically unchanged. On the morning of January 15, the cash on hand had not decreased more than $1,000,00 but the amount due from banks and bankers had fallen to less than $21,000.00. When the bank closed on the 15th the cash on hand had dwindled to about $5,400.00, and the cash reserve, the amount due from banks and bankers, had dwindled to about $8,340.00. In the meantime the active deposits had shrunk from over $170,000.00 to something less than $100,000.00.

On the morning of January 15th, H. H. Stokes, the president of the bank, called the State Bank Examiner over the telephone and asked him to come to Bamberg that day. The bank examiner with several assistants arrived at the bank about 3 o'clock p. m. The board of directors of the bank were called together that evening and voted to close its doors and place it in the hands of the State Bank Examiner. The examiner testified before the master as follows: "I came here and found that the cash reserve was almost completely exhausted and we thought it dangerous to open the

next morning. It was evident that a run was being made, and I advised against opening the bank the next day." A. P. Salley, cashier of the receiver bank, testified as follows: "In my opinion that decrease in cash reserve and due from banks and bankers was a most serious blow to a small country bank. In view of this, in my opinion, the bank could not have safely continued business. * * * That is a serious shock to any small bank. No bank the size of the Bamberg Banking Company can withstand such a blow."

The cashing of respondent's check along with two other checks for near relatives of the bank's president and two checks for near relatives of the bank's cashier constituted the last transaction put through the bank before it was placed in the hands of the State Bank Examiner. It is clear that at the time payment was made to respondent the bank had reached that condition "when from the uncertainty of being able to realize on its assets, in a reasonable time, a sufficient amount to meet its liabilities, it becomes necessary for the control of its affairs to pass out of its hands," and was, therefore, insolvent at the time.

Did the bank intend to give respondent a preference over its other creditors? The bank was insolvent as we have already shown. Its responsible or managing officers are charged with full knowledge of its condition. In the case of *Loan & Savings Bank v. Peurifoy,* 141 S. C., at page 324, 139 S. E., 783, 785, the Court said: "Furthermore, the Columbia Bank closed its doors at 2 o'clock on June 25, 1926, and thereafter, on the same day, the directors by resolution admitted its inability to meet its obligations and placed its affairs in the hands of the State Bank Examiner, and its doors were never reopened. In the face of these facts, the presumption arises that the officers of the bank knew of its insolvent condition, unless we attribute to them the grossest inattention, neglect, and indifference in the management of its affairs."

H. H. Stokes, president of the bank, had gone to
■ Columbia two days prior to its closing and consulted
with the State Bank examiner about its condition.
On the morning of the day the bank closed, when the balance was struck and it appeared that the deposits had decreased nearly $50,000.00, and the amount due from banks and bankers almost as much, he telephoned the examiner to come to Bamberg that day. The examiner arrived just before 3 o'clock p. m. on that day, and at the time of his arrival the amount due from banks and bankers had dwindled to about $8,340.00. Soon after the examiner arrived the treasurer of Bamberg County entered the bank and had the officers cash a check for $10,000.00, the proceeds of this check being placed by him in a safety deposit box belonging to the county and kept in the vault of the bank. After that withdrawal the cash on hand had dwindled to something like $8,500.00. The active deposits had dwindled to something like $100,000.00. A run on the bank was evident. The president, after the withdrawal by the treasurer of Bamberg County, and after consulting with the examiner concerning the condition of the bank, produced a check which had been signed in blank by the respondent, his father, and filled out by himself for $500.00, and cashed the same along with a check for his mother for $100.00, and another check for his sister-in-law for $300.00. At the same time the cashier of the bank cashed a check for his mother for $2,200.00, and another for his uncle for $290.00. The money with which all five of these checks were paid was taken from the cash which had already been placed in the vault of the bank. None of the payees of these checks appeared in person to cash the same. There is some conflict in the testimony as to whether the bank closed its doors for the day when these five checks were cashed. Counsel for both appellant and respondent argued the point thoroughly and ably. It is undisputed that the county treasurer who came into the bank about 3 o'clock and cashed his check for $10,000.00, was the

last person to come into the bank to transact business with it. It is undisputed also that the cash had been taken from the counter and placed in the vault. It is undisputed that the cashing of respondent's check, along with four other checks for near relatives of the bank's officers, from the money that had already been placed in the vault, was the last act of the dying bank. The treasurer of Bamberg County testified as follows: "I think the door was closed behind me when I first came in, but I do not know whether it was locked." The employees and officers of the bank on the day it closed were Mrs. Tom Felder, bookkeeper; H. L. Hinnant, assistant cashier; E. B. Price, cashier; and H. H. Stokes, President. Mrs. Felder testified that she left the bank just before 3:00 o'clock and did not return "until late in the afternoon, about dusk dark"; and that it was after her return that she first saw the J. W. Stokes check and posted it. H. L. Hinnant testified that 3:00 o'clock was the usual closing time of the bank; that on January 15th the cash was placed in the vault two or three minutes before 3:00; that the bank examiner and one assistant came in a few minutes after 3:00; that the county treasurer came in about ten minutes after 3:00, and that H. H. Stokes, president of the bank, then locked the door; that, after the county treasurer had drawn $10,000.00 from the vault and placed it in his lock box, H. H. Stokes unlocked the door, let him out, and then locked the door again; that H. H. Stokes then went with the examiner into the president's office and remained there about twenty minutes; that he (H. H. Stokes) then went into the vault, and after the lapse of several minutes returned and placed upon the counter respondent's check, along with two other checks for his relatives. E. B. Price testified that respondent's check was cashed before the door was closed. However, his testimony as to what occurred after the arrival of the bank examiner and the arrival of the county treasurer was not of a very positive character. He admitted that at the time respondent's check was cashed he

cashed two checks for his near relatives. H. H. Stokes, president of the bank, did not testify in the case. After considering most carefully all of the testimony in connection with the admitted or undisputed facts and circumstances appearing in the case we find that the clear preponderance of the evidence shows that, at the time respondent's check was cashed, the bank had closed its regular and ordinary business for the day, and that this payment to respondent was not made in the due course of the bank's business. We conclude, therefore, that the managing officers of the bank knew of its insolvency and intended to give respondent a preference as contended for by appellant.

Did respondent know, or did he have reasonable cause to believe, that the bank was insolvent at the time his check was cashed, and did he intend to receive a preference over its other creditors? Respondent testified that on account of illness and inability to go to the bank to look after his own business he had handed his son, H. H. Stokes, president of the bank, several days prior to its closing, a check signed by him in blank, with the request that his son bring him $500.00. He was uncertain as to the date of this transaction. He could not say whether it was one week or two weeks before the bank closed. While he testified on direct examination that he expected his son to bring him the money promptly, he also testified several times on cross-examination that he left the time of cashing the check entirely to his son. These are his words: "I don't recall what day I told Henry to bring me the money. It was several days before the bank closed. I did not ask him to bring it to me that day. I don't know about if he was to keep the check until he saw fit to cash it. It was left with him. * * * There was a good bit of discussion, and in December I felt a little bit uneasy, but after Henry agreed to stay there, and when the year started off I was perfectly satisfied, and did not know about the bank closing until the morning after. I did not know that the check was being

cashed until Henry brought me the cash the next day. I did not know when he was going to cash it. I did not know when he would bring it. I left the time of cashing the check to my son, Henry. I did not know when Henry would cash it. I left it with him."

Respondent never explained why he desired the sum of $500.00 in cash. The bank records show that, on January 10, 12, 13, and 14, respondent made other withdrawals from the bank ranging from $2.00 to about $200.00. There is no evidence tending to show that he ever mentioned the check to his son from the day it was signed until his son brought him the $500.00 on the day after the bank had closed. As stated above, H. H. Stokes never testified in the case. It is clear that respondent constituted his son, H. H. Stokes, president of the bank, his agent for the handling of the transaction in question just as effectually as Townsend constituted Ficken his agent in the transaction out of which arose the case of *Mortgage Loan Company v. Townsend,* reported in 156 S. C., at page 215, 152 S. E., 878. The actual receipt of the money by respondent on the day after the bank closed was a complete ratification of the acts of his agent whose knowledge and intent will be imputed to him. The situation of the parties, respondent's relationship to the president of the bank, and his business relationship to the bank itself, as well as other facts and circumstances appearing in this case differentiates this case from the case of *Harlem Corporation v. Eadie,* 152 S. C., at page 264, 149 S. E., 401.

The answer to the fourth question must be in the affirmative. Bamberg Banking Company was insolvent at the time payment was made to respondent; and it could not then and cannot now pay its debts in full. The bank gave to respondent and respondent received an unlawful preference over the other creditors of said bank.

Respondent gave due notice that this Court would be asked to sustain the order appealed from upon the additional

ground that the Circuit Judge should have affirmed also the findings of the master that the bank was solvent at the time that respondent's check was cashed. This question has already been disposed of.

We are not unmindful of the rule consistently followed by this Court in cases of this sort to the effect "that the findings of fact by the master, concurred in by the Circuit Judge, will not be disturbed by this Court unless it is shown that such findings are without any evidence to support them or are against the clear preponderance of the evidence." We are not departing from that rule now. The findings and conclusions hereinabove announced are supported by the clear preponderance of the evidence.

If transactions like the one in the present case are allowed to stand, the application of the principles of equality, of fairness, and of ratable distribution which this Court has so often declared to be the true criterion in making distribution of the assets of an insolvent institution would in a large measure be defeated; and those on the inside of such an institution would be granted an almost unlimited range in preferring their kindred, as well as others in whom they were personally interested, in the distribution of its assets.

The order appealed from is reversed, and the case remanded to the Circuit Court in order that judgment may be entered in favor of appellant against respondent in the sum of $500.00. Let the receiver of Bamberg Banking Company restore the deposit of respondent, J. W. Stokes, to the sum of $1,117.45, as of the date the bank closed its doors, the receiver of the bank having the right to apply all dividends now payable, or hereafter to become payable, on said deposit as credits on the judgment to be entered in the case until such time as said judgment shall have been satisfied in full.

Let the order appealed from be reported.

MR. CHIEF JUSTICE BLEASE and MESSRS. JUSTICES STABLER and BONHAM concur.