13814

TEMPLE *ET AL.* v. McKAY, COUNTY TREASURER, *ET AL.*

(174 S. E., 23)

306

Before Townsend, J., Dillon, October, 1931. 

*Messrs. N. B. Hargrove, L. D. Lide* and *A. F. Woods,* for appellant, 

*Messrs. Gibson & Muller* and *W. C. Moore,* for respondents,

March 28, 1934.

The opinion of the Court was delivered by MR. CHIEF JUSTICE BLEASE.

The receivers of the Bank of Lake View, which closed its doors on January 6, 1931, in this action, sought to recover from Dillon County and its present County Treasurer, certain collaterals, commonly called "bills receivable," assigned and delivered to the predecessor in office of the present treasurer, as security for moneys of the county, and some of its political subdivisions, deposited in the bank, and to recover, also, moneys collected on the collaterals. It was alleged that the purported transfers were unlawful and invalid, for the reasons that the same were made by certain active officers of the bank, without proper authority; that many of the bills receivable were assigned and delivered at a time when the bank was hopelessly insolvent, to the knowledge of its active officers, and when all of its assets constituted a trust fund for the payment of its creditors, ratably; and that thereby an unlawful preference was given the county and its subdivisions, to the detriment of the other depositors.

The answers of the defendants denied the right of the plaintiffs to recover, and alleged that the transfers attacked, and collections made thereon, were in all respects valid, and in compliance with legal requirements.

On testimony taken by the Master, the case was heard by his Honor, Judge Townsend. He held, in effect: (1) Since 1925 it has been the public policy in this State to permit, if not require, State banks to secure deposits of public funds by indemnity bonds, or pledge of securities; (2) that certain provisions of two Acts, later discussed, that deposits of sinking funds of Dillon County be distributed amongst banks of the county, were directory and not mandatory; (3) that a bank receiving such deposits was estopped to plead a violation of the statutory provisions; and (4) that the securities in question were delivered when the bank was a going concern in ordinary course of business, in good faith, before discovery of insolvency, pursuant to contracts made prior to the time of delivery. Accordingly, it was adjudged that the County Treasurer was entitled to retain the securities, to enforce collection of the moneys due thereon, and apply the same after paying the expenses of collection, to the payment of the deposits thereby secured, subject to account to the receivers for any surplus.

The first exception, in the appeal of the plaintiffs from the circuit decree, charges error in a finding to the effect that the securities, sought to be recovered, were delivered in part for the purpose of securing deposits of State funds, when the complaint and the testimony showed, without dispute, that the funds intended to be secured were general funds and sinking funds of Dillon County, and school districts thereof, and that the validity of the pledge of securities for State deposits was not involved in the case. At the beginning of his decree, Judge Townsend, in referring to the purpose of the action as being one "to recover certain bills receivable and securities," assigned by the bank to the County Treasurer, "as collateral security for deposits of

public funds" did inadvertently say, in effect, that the public funds included "State funds." But his error in that regard has no effect on his general conclusion. The exception, therefore, having no real bearing upon the questions for our determination, is dismissed.

Without referring to the ten other exceptions, separately, we shall pass upon the necessary questions they present, according to the contentions of the appellants, stated, however, in our own language:

1. Were the transfers of the collaterals invalid, for the reason they were made at times when the bank was insolvent, to the knowledge of its officers?

2. Even if the bank was not insolvent at the times of the transfers, were such transfers unlawful, in that: (a) There was no legislative authority, authorizing a state bank to pledge bills receivable for the payment of a deposit; (b) if there was such legislative authority, the provisions of the enactment, which were mandatory, were not observed; (c) that it is against the public policy of the State for a bank to secure deposits by the pledge of bills receivable?

3. Were the acts of the officers of the bank, who made the transfers, *ultra vires,* that is, beyond the power of the officers, for failure to have proper authority from the directors?

As to the legal principles involved in the first and second questions, we may observe, at the outset, that the recognized doctrine of this jurisdiction, on the subject of "public policy," is that which was so clearly stated by Mr. Justice Marion, for this Court, when he said: "* * * for purposes of juridical application it may be regarded as well settled that a state has no public policy, properly cognizable by the Courts, which is not derived or derivable by clear implication from the established law of the State, as found in its Constitution, statutes, and judicial decisions." *Weeks v. New York Life Ins. Co.,* 128 S. C., 223, 122 S. E., 586, 587, 35 A. L. R., 1482.

We have not been cited to any constitutional provision, nor do we, at this time, recall any, that necessarily must be considered. We inquire, then, as to any statutes shedding light upon the questions.

Counsel for the respondents have confined their discussion of "legislative authority" to certain acts relating to funds of Dillon County, and its political subdivisions. Counsel for the appellants have referred only to those Acts and to some provisions of Section 7745 of the Code. Apparently, all of the counsel have overlooked one sentence in Section 7862 of the Code, in the article on the subject of "banks and banking." The failure to take note of a provision in that section, applicable here, may be due to the rather confusing headnote of the section, "banking and other powers of corporation." The entire section refers only to powers of banking corporations. Therein, we find that *a banking corporation "may receive on deposit moneys on such terms as may be agreed on with depositors,* and issue certificates therefor, negotiable or assignable in such way as may be inserted in the same." (Italics ours.) That provision first appeared in an Act approved December 24, 1885 (19 Stats., 212), and it has been carried in all the revised statutes and codes to the present time. Obviously, there can be no question that, under the power and authority there conferred, a State banking institution may contract, certainly at some times, and in some circumstances, with a depositor to secure his deposit account by the pledge of collaterals. The language of the provision is very broad, and we know of no limitation thereon, or modification thereof, affecting this case, except possibly such provisions as are contained in the Acts relating to Dillon County, which we discuss, after we have called attention to holdings in several decisions of this Court.

We notice first the case of *Livingston v. Columbian Banking & Trust Co.,* 77 S. C., 305, 57 S. E., 182, 184, 22 L. R. A. (N. S.), 442, 122 Am. St. Rep., 568. In cases too

numerous to be now cited, this Court quoted, with approval, the declaration of that great jurist, Mr. Justice Woods, when he said: "No rule of equity appeals more to the judicial conscience than that which requires the assets of an insolvent corporation to be distributed ratably among creditors."

In his opinion, however, Mr. Justice Woods clearly indicated that the Court did not have in that case, or in any previous case discussed by him, "an intention to deny to a depositor the right to make an express contract with the bank that his deposit account shall be applied to his debts to the bank or to any other legitimate purpose," and he said: "Such a restriction upon the right of an individual to contract with respect to his property would hardly be attempted by any Court." Further, he observed: "Had the checks (those the insolvent bank had given to its depositors) been issued for cash paid into the bank or before insolvency, the other depositors could have interposed no countervailing equity, and the petitioners'(the holders of the checks) would have been entitled to subrogation."

In *Fort v. Bank,* 82 S. C., 427, 64 S. E., 405, 406, Mr. Justice Jones, for this Court, speaking of the decision in the *Livingston case,* said that it affirmed "the right of a depositor to make an express contract with the bank that his deposit account shall be applied to his debts to the bank and to any other legitimate purpose."

The recent case of *Ex parte District Grand Lodge (State ex rel. Bradley v. People's Federation Bank)*, 147 S. C., 103, 144 S. E., 841, has some bearing here. The named bank, being insolvent, closed its doors on September 7, 1926. On June 2nd, prior thereto, the Grand Lodge had on deposit in the savings department of the bank the sum of $19,873.00, drawing 4 per cent interest, *under its contract* with the bank; the deposit, with interest, on July 1st amounted to $20,-071.73. On June 2nd, the Grand Lodge and the bank entered into a written contract, whereby the Grand Lodge expressed its willingness to deposit in the bank an additional amount

of $5,000.00, if the bank was "willing to secure said deposit" (referring to the deposit already in the bank on the date of the contract), and in the contract the bank agreed to secure the deposit by assigning to the Grand Lodge a certain bond, the payment of which was secured by a real estate mortgage, of a third party to the bank. The additional $5,000.00 were not deposited by the Grand Lodge. The bond and mortgage, on which there were due around $30,000.00, were assigned to the Grand Lodge, but the amount due on the bond was collected by the receiver of the bank. This Court held that the leaving by the depositor of the sum of over $20,000.00 in the bank constituted sufficient consideration to support the contract of the bank for the delivery of the collateral security, and directed the receiver to pay from the amount collected by him on the bond and mortgage the deposit of the Grand Lodge. While two members of the Court were of the opinion that the bank, at the time it executed the contract and assigned the collaterals, was in an insolvent condition, and it was the purpose of its officers to give an unlawful preference to the Grand Lodge, a majority of the Court indicated, and perhaps properly so, that the only questions in the case related to a construction of the contract between the Grand Lodge and the bank. Nevertheless, the case recognized the legal right of a bank to give security at some times for a deposit account.

A case which does have very important bearing in the determination of the issues before us is that of *Peurifoy, Receiver, v. Westminster Loan & Trust Co.*, 148 S. C., 100, 145 S. E., 706, 712. Briefly, the facts were these: That State Bank Examiner and an officer of the American Bank & Trust Company, on June 20, 1926, solicited a deposit from the Westminster Loan & Trust Company, and there was a verbal agreement that day if the deposit was made in the American Bank & Trust Company, that institution would give security for the deposit. The deposit was actually made on June 22nd. The American Bank & Trust Company was closed for in-

solvency on June 25th. A day or two before its closing, one of its officers laid aside in the bank certain collaterals as security for the "Westminster deposit," and they were in the same place at the time the receiver took charge. The facts of the case showed that the American Bank & Trust Company was insolvent at the time of the making of the agreement to secure the deposit, and at the time the deposit was made, and this Court, in the earlier case of *Rice v. City of Columbia,* 143 S. C., 516, 141 S. E., 705, 706, involving, also, the affairs of the American Bank & Trust Company, judicially declared that the bank was insolvent on the days of the transaction with the Westminster bank. The right of the Westminster bank to receive and hold the securities, laid aside for it, was upheld by this Court in an opinion of Mr. Justice Carter, who declared: "* * * An agreement having been made to secure the deposit at the time the deposit was procured equity and good conscience required that the agreement be carried out."

The *Rice case, supra,* depended upon strongly by the appellants, adjudged to be invalid transfers of collaterals of the American Bank & Trust Company, "within from 12 to 72 hours at most preceding the closing," to secure three depost accounts of the transferees. The deposits, however, had been made quite a long time before the securities were transferred and delivered; and there was no agreement at the time of, or previous to, the making of the deposits that security for their payment would be furnished. While the Court recognized the principles that the assets of an insolvent bank constitute a trust fund for the payment of its debts, in which all of its creditors are entitled to share ratably, and that the invalidity of a transfer, by an insolvent bank, does not depend upon the knowledge of the transferee that it is insolvent, still the Court did not overlook another legal principle, namely, that a bank, even when insolvent, may create a lien on its assets for a valuable consideration, received by the bank at the time of the creation of the lien.

The Court quoted, with approval, from the syllabus of *Dabney v. Bank,* 3 S. C., 124, the following: "The assets of an insolvent bank are a trust fund for the payment of its creditors, whether as guarantees, bill holders, depositors, or otherwise, *and if there is no lien on the fund,* the distribution among the creditors must be *pari passu.*" (Italics ours.)

*Peurifoy, Receiver, v. Continental Finance Co.,* 164 S. C., 261, 162 S. E., 458, relied upon, also, by the appellants, involved what the claimant asserted was a "special deposit," and therefore impressed with a trust, but the Court did not sustain the claim, because there was nothing to show that the facts of the case took it out of the equitable rule, requiring the assets of an insolvent corporation to be distributed ratably, and held, in effect, that the deposit was a general one, and there was no security for its payment.

*Mortgage Loan Co. v. Townsend,* 156 S. C., 203, 152 S. E., 878, another of the appellants' cases, resulted in an adjudication that certain assignments of securities, transferred in the dying days of a closing bank, by one of its officers to a close friend, upon the consideration of the payment of checks on the deposit account of the friend, were invalid, for the reason that the assignments were unlawful preferences. Let it be remembered that the facts clearly showed that the deposit account was an old one, and no new money, or any *present* consideration, passed to the bank at the time the assignments were made. Neither was there at any time an agreement on the part of the bank that the payment of the deposit account would be secured.

*Bradley, State Bank Examiner, v. Guess,* 165 S. C., 161, 163 S. E., 466, 470, another case referred to by the appellants, presented many interesting questions, among them that of trust *ex maleficio.* Guess, who was a stockholder in the bank, in the spring of 1920, placed with the cashier for safe-keeping certain Liberty bonds; the cashier had authority to clip and collect interest coupons, and deposit the amounts thereof, as collected, to the deposit account of Guess. In the

fall of 1920, the cashier, who was almost solely in charge of the affairs of the bank, without the knowledge or consent of Guess, abstracted from their place the Liberty bonds, and negotiated thereon, with other banks, loans to his bank. In May, 1921, Guess discovered what the cashier had done, and that official promised Guess that he would substitute other sufficient collateral with the creditor banks in place of the bonds, and restore the bonds to Guess; and if he failed to do that, within a reasonable time, he would see that Guess was secured to the value of his bonds. Soon thereafter, the promise of the cashier was confirmed by the directors of the bank. The bank regularly passed to the credit of the deposit account of Guess the interest he would have received from the bonds. It seemed to be the understanding that certain bonds, secured by mortgages of real estate, would be assigned to Guess. The Liberty bonds, held by the three creditor banks, were sold on August 4, 1923, and March 13, and May 30, 1924. A balance from the sale of the Liberty bonds, coming to the debtor bank, was paid over to it. In December, 1923, Guess became a director of the bank. In March, 1924, learning of sales by two of the creditor banks of the bonds, the directors, not including Guess, resolved to carry into effect the agreement of May, 1921; to indemnify Guess as nearly as they could. Three of the mortgages promised to him having been foreclosed, and the title to the property having come to the bank, mortgages over those lands were executed in favor of Guess by the bank, and another bond and mortgage, held by the bank were assigned to Guess, as security for the debt acknowledged by the bank to be due to Guess on account of the abstraction of his Liberty bonds. The appellants point us to the following language in the Court's opinion:

"It is undisputed that Guess had no lien upon any of the assets of the bank prior to March, 1924—the promise to give him security for the use of his bonds could not con-

stitute a lien; if the bank was insolvent in March, 1924, no valid lien could be given to Guess or any other creditor.

"It is immaterial whether or not Guess knew of the insolvency of the bank when the securities were given to him; the invalidity of such transfers depends, not upon the knowledge of the transferee, but upon the fact of insolvency of the bank."

A study of the whole opinion, however, must be considered to properly understand the effect of the quoted language. In effect, it was held that Guess had waived his rights to preference, on the theory of a trust *ex maleficio;* that the bank was insolvent at the time the mortgages and assignment of mortgages were executed and delivered to Guess; and the failure to record the mortgages of the bank to Guess also entered into the decision. It was expressly held that the Circuit Judge had committed error in holding that the securities given Guess "were executed for a present fair consideration," and, on the other hand, "such securities were given undoubtedly to secure an obligation that had arisen three or four years prior thereto." The Court did not overlook, either, the fact that the promise to give Guess a lien was made some time after the bank's obligation to him had been created.

*South Carolina State Bank, Receiver, v. Stokes,* 169 S. C., 173, 168 S. E., 541, is also called to our attention by the appellants. There, just before a bank closed its doors, one of its officers cashed a check of his own father on the latter's deposit account; the officer had been carrying the check for several days. In a suit by the receiver to recover from the father the amount of the check, we held that the son was the father's agent in the transaction; that the agent knew of the insolvent condition of the bank, and the money obtained on the check amounted to a preference. The case did not in any wise involve security obtained for a deposit.

There is one very important decision, which seems to have been entirely overlooked by all of the counsel in the case,

who, generally, are unusually careful in their investigations. That is the case of *Wylie v. Bank,* 63 S. C., 406, 41 S. E., 504, 509. One declaration contained in the opinion of Mr. Associate Justice Pope, concurred in by Chief Justice Mc-Iver and Associate Justices Gary and Jones, which appears never to have been overruled, or even doubted, since its announcement, shows not only that a solvent bank may give security for deposits, accepted by it, but that even a bank, in the throes of apparent financial disaster, may sometimes do so. The declaration is in this language: *"But when a bank is threatened with insolvency, in order to induce deposits, it is not illegal to give security for the performance of its already legal duty."* (Italics added.)

While the provision in Section 7862 of the Code, with reference to the power of a bank to make "terms," upon which deposits are received, to which attention has been directed, was not specifically mentioned, so far as we have discovered, in any of the decisions referred to, all of which cases, with the exception of *Dabney v. Bank, supra,* were decided after the enactment of that provision in the Act of 1885, still it must be assumed that the Court, in many, if not all, of the cases, had in mind the effect of that provision. There is certainly nothing in any of the decisions in conflict with the construction we have placed upon the language of the provision. If the statutory authority to make terms with a depositor was overlooked, however, at any time, it is clear in the decisions the Court was of the opinion that a bank could give security for deposits, without that specific authority conferred by the statute. The result would be then, that the decisions sustaining the right of a bank to give security for deposits was strengthened by the legislative enactment.

The appellants have called our attention to holdings of the Supreme Court of the United States in the cases of *Texas & Pacific Railway Co. v. S. O. Pottorff, Receiver of the First National Bank of El Paso,* 54 S. Ct., 416, 78 L. Ed.

——, and *City of Marion, Illinois, v. Ben Sneeden, Receiver, et al.,* 54 S. Ct., 421, 78 L. Ed. ——, the decisions in which were filed on February 5, 1934, and were written by Mr. Justice Brandeis. It was held in the case first named that a national bank, doing business in the State of Texas, had no authority, under the National Bank Act (13 Stat. 101), to pledge Liberty bonds to secure the payment of the deposit of a railroad company. The decision was based on the failure of Congress to grant a national bank, in the National Bank Act, the authority to pledge any of its assets for the payments of deposits—we may add either of private or public funds.

In the second case, the pledge of assets of a national bank to secure the deposit of a municipality was held to be invalid, although Congress, by its Act of June 25, 1930, c. 604, 46 Stat., 809 (12 U. S. C. A., § 90), had amended Section 45 of the National Bank Act of 1864 (13 Stat., 113), by granting a national bank the right to give security for deposits in such bank "of the same kind as is authorized by the law of the State in which such association (a National bank) is located in the case of other banking institutions in the State." The invalidity of the pledge in that case was based upon the fact that the State of Illinois, where the national bank that had given the pledge was located, had not conferred upon the banking institutions in that State the power to make such pledges.

Clearly, then, the two decisions of the Federal Supreme Court have no application here, for at least two reasons: (1) The pledges of assets declared unlawful in the cases were those of national banks, while with us the pledges were of assets of a state bank; and (2) we have held that there is authority in the law of this State for the pledging of the assets of state banks for the payment of deposits.

We may say that we have read with much interest the remarks of Mr. Justice Brandeis, for whose great learning we, in common with the bench and bar of this country, have

the highest regard, with reference to the impropriety, both as matters of equity and of public policy, of permitting banks to pledge assets to secure deposits. What he has there said is worthy of the deliberate consideration of those charged with the making of our laws.

In analyzing all of our cases, relating to banks and banking, including those we have cited, we must not overlook that this Court has held repeatedly, in cases too numerous to be here mentioned, that the ordinary relationship between the bank and its depositor is that of debtor and creditor; and at no time has this Court ever failed to hold, so far as we are advised, that a debtor even if insolvent, may make a new obligation, for "a present fair and valuable consideration," to either an old or a new creditor, and secure its payment by a pledge, or mortgage of his property, or any part thereof, if the transaction between the parties is not tainted with a fraudulent intention, or is not forbidden by some law of the state or nation.

With due regard to the provision in Section 7862, and the holdings in the cited cases, it must be apparent that, under the laws of this State, a bank, whether solvent or insolvent, may pledge its assets for the payment of a deposit made contemporaneously with the agreement as to the pledge, or to secure a deposit placed in the bank after the making of the agreement to give security, pursuant to its terms, if there is no fraud or collusion in the transaction. There is no distinction, either, between pledges to secure the payment of public and private funds, unless such distinction is made in some legislative enactment.

At this stage, we pass to a consideration of the statutory enactments referred to in the arguments of counsel, with the purpose of ascertaining what effect, if any, they have upon the general statutory law, and the holdings in the cases reviewed, which decisions, of course, did not involve in any way these particular acts. We are in accord with the view of the appellants that the provisions of

Subdivision 8 of Section 7745 of the Code, granting the power to borrow money by corporations, chartered under the article relating to "Business Corporation," do not have any bearing upon the issues in this cause.

Looking to the Dillon County "Supply Acts" for the several years, beginning with the year 1921 and ending with that of 1930, during which times the deposit transactions under review in this case appear to have occurred, we find that annually the Act contained provisions as to the deposit of the public funds of the county in the banks thereof. In 1921, the regulations included "the entire county account." In 1922 (32 St. at Large, p. 436, 1166), and each of the succeeding years, however, the regulations expressly excluded "deposits of sinking funds." At first, in 1921, a bank in which the funds were deposited was required to "enter into a bond to indemnify the county in case of loss." In 1922, the bond to be given by the bank was to be "a surety bond." In the Act of 1923, and in the succeeding Acts, the bond was permitted to be either "a personal or surety bond." In 1929, the Act (36 St. at Large, p. 496, § 1), provided that the money should be deposited in the four banks of the county, in approximately equal amounts, and should be drawn therefrom in a manner to keep the balance in the banks approximately the same at all times. In the other years, however, the Acts, generally, provided that bids for loans of money to the county might be made, upon the condition that the public funds, excepting sinking funds, should be carried on deposit in the bank making the loan.

The first sinking fund Act was approved on March 19, 1925 (34 Stats., 182), now Section 2811 of the Code. It provided that moneys of the sinking funds should be deposited by the custodians "annually in all banks of Dillon County according to the capital and surplus of such bank or banking institution," with the provision that if any bank failed to comply with the terms of the Act, the deposits of the sinking funds were to be prorated to the other banks, ac-

cording to the capital and surplus. Any bank receiving any deposit was required to "execute and deliver to the County Commissioners a personal bond or pledge sufficient collateral as security."

It seems to be conceded by counsel that the Act of 1925 was repealed by the Act approved March 23, 1926 (34 Stats., 992), now Section 4267 of the Code. Since both Acts were incorporated in the Code of 1932, it is likely the Court, in passing upon Dillon County sinking fund matters, occurring since the adoption of the Code, would have to consider both of the Acts, but because of the concession of counsel, and for the reason that the transactions under review here did not occur after the adoption of the 1932 Code, but prior thereto, we shall adopt the view of counsel that the 1925 Act was repealed by the later enactment.

In the last Act, the County Treasurer was directed to invest the sinking funds then on hand, and thereafter, within six months from the collection of taxes levied for sinking fund purposes, in bonds of certain political subdivisions of the State. But the Act said that the Treasurer and the County Board of Commissioners might, in their discretion, from time to time, invest a portion of the sinking funds, not exceeding 25 per cent of the total amount accumulated, in mortgages of real estate, situate in Dillon County. The Act further provided that the Treasurer might deposit not more than one-third of the sinking funds "in the bank or banking institutions of said County of Dillon on the basis of their capital stock * * *" if any bank receiving such funds for deposit would "furnish sufficient bond or security conditioned for the safe keeping of such funds and for the paying over of same with interest thereon at the rate of not less than four (4%) per cent. *per annum.*"

There is a suggestion in the argument of counsel for the appellants that, under the authority of *Gillespie v. Blackwell,* 164 S. C., 115, 161 S. E., 869, the Sinking Fund Acts may be unconstitutional. But we do not apprehend that it is their

intention to positively so assert, for we do not find in the record at any place that any question as to the constitutionality of the Acts has been properly raised. We may add, too, that if it had been raised, and sustained by this Court, the effect would not be beneficial to the appellants, for under our holdings, then clearly the provision contained in Section 7862 of the Code, *supra,* and the legal principles announced by us heretofore as controlling the case, would justify the action of the officers of the county in accepting from the bank pledges of assets for deposits of sinking funds. And, as we understand one of the questions made by the appellants, which we shall now proceed to discuss, they take the position that the pledging of the assets to secure the deposits of sinking funds was invalid, because of the failure of the county officials to observe the provisions of those Acts.

We are inclined to agree with the view of the learned Circuit Judge that the provisions of the Sinking Fund Acts, in many respects, were directory. and not mandatory. Consider first the Act of 1925 : The sinking funds were required to be deposited by "the custodians of such public fund or funds annually," in all the banks of the county, "according to the capital and surplus of such bank or banking institution." Any bank receiving such deposit was required not only to furnish a bond, or pledge sufficient collateral as security, to guarantee the payment of the deposit, but the bank was required also to pay 4 per cent per annum interest on the deposit, less the costs of the premium on any bond furnished. Suppose the bank had refused to give the bond, or refused to put up the collateral, or refused to agree to pay 4 per cent interest, who would have had the power to have forced the bank to do all, or any, of these things? In the event of the refusal of any one bank, and it seems there were at times four banks in the county, until all of them closed, to agree to the terms of the Act, what could the custodians of the money do with the sinking funds? They were required, under all our laws pertaining to the subject, to take

good care of the money. Too, the Act seems to indicate that there was more than one custodian, perhaps several custodians, of the funds. How, ordinarily, could one of these custodians, all the time, have been fully informed as to what the other custodians were doing?

Now consider the Act of 1926, which does seem to be a little clearer than the former Act: Still much of it seems confusing to us. First, the County Treasurer, alone, was directed to invest the sinking funds in bonds of political subdivisions of this State. He might, however, with the County Board of Commissioners, invest a part of the funds in real estate mortgages, if the amount invested did not at any time exceed 25 per cent of the total accumulated sinking funds. Too, the Treasurer might deposit as much as one-third of the funds "in the bank or banking institutions of said County of Dillon on the basis of their capital stock," providing a bank receiving the funds should furnish security for their safe-keeping and agree to pay interest of not less than 4 per cent per annum. What we have pointed out as to the difficulties in complying with the terms of the 1925 Act, as to bank deposits, is applicable, also, to the 1926 Act. If he wished to invest the moneys in the bonds he was authorized to purchase under the terms of the Act, could the Treasurer at all times have been able to buy the bonds he was permitted to invest in? If so, what price was he to pay for them? The Act does not state. Perhaps he could not at some time have bought bonds at par, if he was able to buy at all. Perhaps he could not make the permitted investments in real estate mortgages, either, since he had to secure the consent of the County Board of Commissioners to such investments, and the amount loaned on a real estate mortgage could not be in excess of 50 per cent of the appraised value of the real estate as made by the County Board of Commissioners.

As to both Acts, this significant question occurs to us: What was the County Treasurer, and the other custodians,

to do with the money of the sinking funds, if investments could not be made according to the terms of the Acts, and all the banks of the county would not agree to take the moneys on deposit in accordance with the terms of the Act? All of the custodians were required to carefully guard the money, and it has been the custom for many, many years, one of which the Court may take judicial notice, that public funds have been usually deposited in banks. A County Treasurer, who kept, for any length of time, thousands of dollars in an ordinary safe in his office, at the risk of having the safe burglarized, when he might have deposited the same in banks, thought to be safe, was subject to great adverse criticism. Besides, moneys in safes do not draw interest.

The Sinking Fund Acts must be construed in connection with the provision in Section 7862. The first Act provided that before a custodian of sinking funds should deposit any of the funds in a bank in Dillon County, the bank must furnish "an indemnity or personal bond or *pledge sufficient collateral as security*" for the payment of the deposit and interest thereon. The second Act said that a bank receiving a deposit of moneys of the sinking funds should "furnish sufficient bond *or security* for the deposit," and the payment of interest. The language of the Acts permits the Treasurer to accept *pledges of assets,* for in the first Act the word "collateral" was used, and in the second the word "security" was used, and the meaning of each word is large enough to include bills receivable. It necessarily follows that the Treasurer and the bank had the lawful right to make agreements that assets would thereafter be pledged for deposits that would be made. Those terms of the Acts, whether they be mandatory or directory, harmonize with the general provision contained in Section 7862, whereby a Treasurer, as well as any other depositor, has the right to make terms as to his deposits.

While the "security" provided for in the Supply Acts was to be either a personal or surety bond, and there was

no direct permission therein to accept pledges of collaterals as securities, yet there was absolutely nothing in either of the Acts forbidding the fiscal authorities of the county, charged with the approval and acceptance of the banks' bonds, from requiring, in addition to such bonds, pledges of assets. The record discloses that as far back as December 29, 1921, some 20 individuals, shown by the testimony to be officers, directors, and stockholders of the bank, executed a written instrument in the nature of a bond, guaranteeing the payment of all deposits made in the bank by Dillon County, its officers and agents. The testimony in the case discloses that, on account of general banking conditions throughout the country, the Treasurer was, evidently, not quite satisfied to leave large deposits in the Bank of Lake View, or any other bank for that matter, unless he had, what he conceived to be, a sufficient amount of collaterals as security therefor, and he required the agreement on the part of the bank to put up such collaterals as security for the deposits he made. The active vice-president of the bank, formerly its president, testified that the collaterals assigned and delivered were "additional security" to the personal bond formerly furnished by the bank.

Because of the facts developed and the provisions of the Supply Acts, as to the security to be given, it is strongly contended and argued in behalf of the appellants that the bills receivable, put up by the bank as security for the deposits, cannot, in any event, be held to secure deposits, other than sinking fund deposits. The reasoning, upon which this position is based, is that the general depositors of the bank had the right to assume that both the officers of the bank and the county officials had complied, and would comply, completely with the legal provisions as to security for deposits, that is, that the security furnished would be by way of bond, and not by the pledge of collaterals, and that the general depositors were justified at all times in looking to the bills receivable of the bank as assets from

which they might obtain payment in full, or in part, of their deposit accounts. The theory, and the argument to sustain it, we must confess, express ideas we might feel personally inclined to follow. The observations of Mr. Justice Brandeis, in the federal cases before mentioned, along that same line, keep recurring to our minds. That, however, as already indicated, involves a matter of public policy. That policy, as remarked in the early part of this opinion, must be derived from our Constitution, statutory enactments, and judicial decisions. The public policy is not as it is suggested it ought to be, under our statutes and decisions. For a long time, too, there has been a general recognition of the fact that careful public officers seek to protect public funds deposited by them in banks, by obtaining proper security therefor. Moreover, every citizen of the State is presumed to know the law of the State. That law, as we have pointed out, has authorized County Treasurers, and all other public officials, to make terms with banks for the securing of deposits of moneys made by them.

It is suggested, or more properly stated, perhaps, it is only intimated, that the purpose of the pledging of the collaterals was to relieve the sureties of the bond from liability on account of that obligation. This matter might be easily disposed of by saying that we do not think it has been properly raised in the case. Beyond that, however, the testimony to which we have already referred, to the effect that the collaterals were pledged as additional security to the bond, which was nowhere disputed, tends to show, thus far at least, that the County Treasurer and the officers of the bank acted in good faith. There is no question, either, at this time, for us to decide as to the rights of the depositors to have the county, and its treasurer, to resort first to the bond for the recovery of its deposits, and if that proves insufficient for the purpose, to proceed later to recover out of the bills receivable, for no issue along that line has been raised in the case.

The third question stated by us, relating to the power of the active officers of the bank to make the agreements and pledge the collaterals, is, we think, easily answered. The evidence clearly established that during the time of the transactions, being here considered, the president of the bank, who later was active vice-president thereof, and the cashier accepted the deposits, made the agreements as to the pledging of assets, and delivered them; that these officers absolutely controlled and directed the business of the bank; that all the directors, with the possible exception of one, knew that the bank was receiving large deposit sums from the County Treasurer, and there is no showing that any director, at any time, ever questioned the powers of the active officers, or disputed the right of either of them to act.

Our first question, as to the solvency or insolvency of the bank at the time of the transfers, as shown by the evidence, is, we admit, attended with considerable difficulty. The case is another illustration of the truth of the saying in *Dunbar v. Fant, State Bank Examiner,* 170 S. C., 414, 170 S. E., 460, and other cases, to the effect that the solvency or insolvency of a bank is one that gives the Courts much difficulty. Here, a very competent auditor, it appears, a while after the bank had closed its doors, made a very thorough examination, and he testified that the bank had been insolvent, in his opinion, for some time before it finally closed. His was the only testimony tending to establish insolvency during the times the collaterals were pledged; and, necessarily, his testimony was only of an "opinion character." His knowledge and information came entirely from his post mortem examination. It is rather easy, after the collapse has come, to express an opinion that it was bound to come. The County Treasurer testified that he, at all times during his transactions with the bank, had considered it a right strong institution; that it had withstood the depressed conditions of the country a considerable time after another bank of the county, with supposedly larger assets, had been

compelled to close its doors. The vice-president testified that he did not begin to suspect the insolvent condition until the fall of 1930, after the transactions pertaining to the deposits in question had taken place, and, previous to the indicated time, he regarded the bank as solvent. A bank, apparently, quite solvent today, may tomorrow, because of the collapse of the stock market, become insolvent. A bank in an agricultural community, like that in which the bank here was located, to all appearances in good financial condition, may prove in a few weeks to be insolvent, because of the decline in the values of farm lands and prices of farm commodities. We cannot say that Judge Townsend, with the little evidence before him, was wrong in his findings to the effect that the bank was not insolvent, as a matter of law, at the time of the transfers of the collaterals. The question of insolvency, or that as to the time it first occurred, has become, however, under our view of the law, one of no great importance; for, if the bank was solvent or insolvent, in the absence of fraud, and with no law forbidding him from so doing, the County Treasurer of Dillon County had the right to contract at the time for security for deposits then being made by him. Also, he had the right, under the law, to contract in advance for the securing of deposits to be made thereafter in pursuance of the contract. We may add, too, that as a public officer, it was his duty to protect the public interests. Those principles of law control this case. If, without any advance agreement, the collaterals had been pledged to secure deposits formerly made in the bank, a different question would arise, and the case would be controlled by the principles declared in *Rice v. City of Columbia, supra,* and *Bradley v. Guess, supra.*

The judgment of this Court is that the decree appealed from be, and the same is hereby, affirmed.

Messrs. Justices Stabler, Carter and Bonham concur.